IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| **ANDREA GAIL JONES** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | Civil Action No.: _____ |
| | ) | |
| **SOUTHPEAK INTERACTIVE** | ) | 3:12CV443 |
| **CORPORATION OF DELAWARE** | ) | |
| Serve: Corporation Service Company | ) | |
|       Registered Agent | ) | |
|       Bank of America Center, 16th Floor | ) | |
|       1111 East Main Street | ) | |
|       Richmond, Virginia 23219 | ) | |
| | ) | |
| **TERRY M. PHILLIPS** | ) | |
| Serve: Terry M. Phillips | ) | |
|       2100 Dalmore Lane | ) | |
|       Midlothian, Virginia 23113 | ) | |
| | ) | |
| **MELANIE J. MROZ** | ) | |
| Serve: Melanie J. Mroz | ) | |
|       124 Weston Lane | ) | |
|       Southlake, Texas 76092 | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff Andrea Gail Jones ("Plaintiff"), by counsel, hereby alleges the following

causes of action:

## INTRODUCTION

1.    Plaintiff brings causes of action under the Sarbanes-Oxley Act of 2002

(the "Sarbanes-Oxley Act") and the Dodd-Frank Wall Street Reform and Consumer

Protection Act of 2010 (the "Dodd-Frank Act") against her former employer SouthPeak

Interactive Corporation of Delaware ("SouthPeak"), and certain of its directors, officers,

agents, and professional advisers (collectively "Defendants"), for unlawful termination from her position as chief financial officer for objecting to, opposing, and providing information about conduct that Plaintiff reasonably believed constituted violations of "law, rule or regulation," of the United States Securities and Exchange Commission ("SEC") and other provisions of federal and state law relating to fraud upon shareholders.

2.      Plaintiff also brings an action for breach of an additional consideration contract under Virginia law against SouthPeak.

3.      Plaintiff seeks to recover back pay, front pay, compensatory damages, punitive damages, other special damages, reasonable attorney's fees, and costs incurred as a result of Defendants' unlawful misconduct.

## JURISDICTION AND VENUE

4.      Prior to and at the time of Plaintiff's termination, SouthPeak was a publicly traded corporation with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C § 78l), and filed reports required by Section 15(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)).   Prior to and at the time of Plaintiff's termination, SouthPeak was therefore subject to the provisions of Sarbanes-Oxley Act of 2002.

5.      This Court has jurisdiction over Plaintiff's claim under the Sarbanes-Oxley Act because that Act authorizes court actions by private parties who allege discharge or other discrimination in violation of 18 U.S.C. § 1514A in the appropriate district court of the United States without regard to the amount in controversy if the Secretary has not issued a final decision within 180 days of filing an administrative complaint.

2

6.      Pursuant to 29 CFR § 1980.114(a), on or about October 5, 2009, Plaintiff timely filed an administrative complaint with the United States Department of Labor, providing a copy of the complaint to the office of the Occupational Safety and Health Administration Regional Administrator.

7.      More than 180 days have passed since the filing of that complaint without the issuance of the final decision by the Secretary of Labor.

8.      Plaintiff served advance fifteen-day written notice to SouthPeak and the Department of Labor of her intent to file this proceeding as required by 29 CFR § 1980.114(b).

9.      This Court has jurisdiction over Plaintiff's claim under the Dodd-Frank Act because that Act authorizes court actions by private parties who allege discharge or other discrimination in violation of 15 U.S.C. § 78u-6(h)(1)(A) in the appropriate district court of the United States within three years after the date when facts material to the right of action are known or reasonably should have been known to the employee alleging a violation.

10.     Plaintiff was terminated on August 14, 2009.  Thus, it has been less than three years after the date when facts material to the right of action are known to Plaintiff.

11.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the Sarbanes-Oxley Act and the Dodd-Frank Act, laws of the United States, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the subject matter of Plaintiff's state law claim for breach of an additional consideration contract because this claim is related to and forms the same case or controversy as Plaintiff's claims under the Sarbanes-Oxley Act and the Dodd-Frank Act.

12.     Venue for this action lies properly in the United States District Court for the Eastern District of Virginia, Richmond Division, pursuant to 28 U.S.C. § 1391 because the events giving rise to Plaintiff' claims occurred in Chesterfield County, which is a territory included within those assigned to the Richmond Division of the Eastern District of Virginia.

## PARTIES

13.     Plaintiff is a citizen of the Commonwealth of Virginia residing in Chesterfield County, Virginia and was an employee of SouthPeak from approximately June 20, 2007 until August 14, 2009.

14.     SouthPeak is a Delaware corporation with its principal office located at 2900 Polo Parkway, Midlothian, Virginia 23113.

15.     Defendant Terry Phillips ("Phillips") was the Chairman of the Board of Directors of SouthPeak since May 2008 through Plaintiff's termination, and, as of October 1, 2010, was the majority shareholder of 30% of the outstanding shares of SouthPeak.  On information and belief, Phillips resides in Midlothian, Virginia, in Chesterfield County, Virginia.

16.     Melanie Mroz ("Mroz") was the President, Chief Executive Officer, and Director of SouthPeak since May 2008 through Plaintiff's termination, and, as of October 1, 2010, was the holder of 5.3% of the outstanding shares of SouthPeak.  On information and belief, Mroz resides in Southlake, Texas.

## FACTUAL BACKGROUND

17.     Plaintiff is a Certified Public Accountant with extensive experience in public accounting.

4

18.     SouthPeak designed, developed, and distributed computer and video games.

19.     SouthPeak employed Plaintiff from June 20, 2007 through August 14, 2009.

20.     Plaintiff received a base salary of approximately $105,000 per year at SouthPeak.

21.     On or about October 30, 2007, SouthPeak promoted Plaintiff to the position of Chief Financial Officer of SouthPeak Interactive, LLC.

22.     On or about late 2007 or early 2008, Plaintiff received approximately $31,855 of additional compensation paid for work related to the preparation of financial reports and securities filings.

23.     On or about December 25, 2007, Plaintiff received a cash bonus of $4,375 as a "Christmas bonus."

24.     On May 12, 2008, SouthPeak became a public company through the sale of all of the membership interests in SouthPeak Interactive, LLC to GSPAC Corp., a public shell company ("GSPAC"). GSPAC then changed its legal name to SouthPeak Interactive Corp. At the time of the transaction, Plaintiff became CFO of SouthPeak Interactive Corp.

## Stock Options and Restricted Stock

25.     In May 2008, the SouthPeak's board of directors and its shareholders approved the 2008 Equity Incentive Compensation Plan (the "2008 Plan") for the grant of stock awards, including restricted stock and stock options, to officers, directors, employees and consultants. The 2008 Plan expires in May 2018.

26.     On July 1, 2008, Plaintiff received stock options and restricted stock from SouthPeak as additional compensation and/or a bonus. Plaintiff received approximately 5,500 shares of restricted stock valued at $2.30 per share for a total of approximately $12,650. Plaintiff also received stock options valued at approximately $52,800. One third (1/3) of SouthPeak stock options vest one (1) year after an employee receives the stock options. SouthPeak restricted stock vests one (1) year after an employee receives the restricted stock.

27.     On December 31, 2008, Plaintiff received an additional 10,000 stock option shares valued at approximately $7,200. In addition, on or about that day, Plaintiff received a cash bonus of $4,375 as a "Christmas bonus."

28.     On July 1, 2009, one third of the stock options Plaintiff received on July 1, 2008, vested. Plaintiff never exercised these stock options. Upon her termination, Plaintiff was forced to forfeit the one third of unexercised, vested stock options received on July 1, 2008, the remaining two thirds of unvested stock options received on July 1, 2008, and the unvested stock options received on December 31, 2008.

29.     On or about January 2009, a recruiter from Atlanta approached Plaintiff for preliminary discussions for a position as chief financial officer for a clean energy company that wanted to expand operations. Plaintiff did not pursue the opportunity because of the success of SouthPeak at the time, the compensation Plaintiff received, and the anticipated and/or promised receipt of further stock options and restricted stock.

30.     On or about June or July 2009, Phillips told Plaintiff that SouthPeak planned to award employees additional stock options and restricted stock.

31.     From June 30, 2009 to March 30, 2010, SouthPeak granted 1,085,000 shares of restricted stock and 677,000 stock options.

32.     From September 30, 2009, after Plaintiff's termination, to March 30, 2010, SouthPeak granted approximately 1,020,000 shares of restricted stock and 349,000 stock options.

### The Phillips Advance

33.     In February 2009, Phillips and Mroz decided to obtain inventory from Nintendo consisting of computer games entitled "My Baby DS."  However, SouthPeak lacked sufficient funds and accessible lines of credit to pay for the purchase at that time. Phillips indicated to Mroz that he was willing to advance funds for the purchase of the inventory from his personal funds.

34.     On or about February 13, 2009, Phillips' assistant, Karen Josephsen ("Josephsen"), at Phillips' direction, arranged for a wire transfer of approximately $307,440 from Phillips' personal funds to Nintendo in payment for 50,400 units of "My Baby DS" (the "Phillips Advance").

35.     Josephsen did not immediately record the Phillips Advance on the books of the company as a payable or as any other liability or charge.  On information and belief, Josephsen informed Patrice Strachan ("Strachan"), the Vice President of Operations of SouthPeak, of the Phillips Advance and gave her the appropriate information to book the transaction.  Strachan was responsible for ensuring the proper recording of accounts payable in SouthPeak's books and records.

36.     In March, 2009, Eric Bradford ("Bradford"), Director of Operations of SouthPeak, learned that SouthPeak received the My Baby DS inventory from Nintendo,

and sought to understand how SouthPeak paid for the inventory.  On information and belief, Bradford asked his new immediate superior, Strachan, how SouthPeak had paid for the inventory.  Strachan informed Bradford that Phillips paid for the inventory personally and Strachan further directed Bradford not to tell anyone else in the company about the transaction, including Jim Huyck ("Huyck"), an accounting analyst, as well as your Plaintiff.

37.     In late March 2009, Staff Accountant Gerald Hicks ("Hicks") received the invoice for My Baby DS inventory.  Unable to identify a corresponding payment to go with the invoice, Hicks sought direction from his immediate supervisor, Strachan, who failed to provide Hicks with information or instructions to book the invoice in the accounting system.

38.     On May 15, 2009, SouthPeak filed its quarterly financial report for the three month period and nine month period ending March 31, 2009 on SEC Form 10-Q (the "3/31 10-Q").  The 3/31 10-Q reflected sales of the My Baby DS inventory, but did not reflect its cost, as Strachan had not permitted or enabled Hicks to book a cost for such inventory.

39.     Between May 20 and May 28, after filing of the 3/31 10-Q, Strachan directed Hicks to enter a Nintendo Invoice dated in March for the My Baby DS inventory (the "My Baby Invoice") with a date subsequent to March 31, 2009.  Unable to find evidence of payment of the My Baby DS Invoice, Hicks approached Huyck for instructions for entering the My Baby DS Invoice.  Huyck reviewed the information that Hicks gave him, but could not determine how to book the invoice without knowing how the My Baby DS Invoice was paid.  Consequently, Huyck approached Bradford and, after

persistent inquiry by Huyck, Bradford revealed that Phillips had paid Nintendo by wire transfer and that Strachan had ordered him not to tell anyone else in the SouthPeak, including Huyck and your Plaintiff.

40.     On or about May 28, Huyck told Plaintiff what he had learned from Bradford about the Phillips Advance, the Nintendo transaction, and Strachan's directive to Bradford not to reveal the Phillips Advance to anyone in SouthPeak and, upon confronting Bradford about his comments to Huyck, Bradford confirmed the same. Consequently, Plaintiff instructed Huyck to continue to look for evidence of payment of the My Baby DS Invoice.

41.     On May 29, Plaintiff met with Phillips at approximately 4:00 p.m. in his office to discuss the My Baby DS Inventory issue and the Phillips Advance.  In that meeting, Phillips told Plaintiff that he had instructed Josephsen to make the payment for the My Baby DS Inventory out of his personal funds and that he knew that there should have been an invoice for the transaction.  Phillips, therefore, knew that by paying for the inventory with the Phillips Advance, the company would understate its actual costs, unless the advance was properly recorded as a payable to him.

42.     Based on her discussions and investigations, Plaintiff believed in good faith that Strachan's instructions not to disclose the Phillips Advance, and the Phillips Advance itself, represented an intentional effort by Phillips, Strachan, and possibly others to keep hidden from the individuals within the Company and potential SouthPeak shareholders that Phillips was advancing money for the company and understating SouthPeak's true product costs in order to report higher profits.

43.     As a direct result of Strachan's instructions to Bradford and Hicks with regard to the My Baby DS Inventory and the Phillips Advance, the 3/31 10Q overstated SouthPeak's profit (or understated its loss) by over $300,000.

### Plaintiff's Efforts to Report

44.     On June 8, 2009, Plaintiff notified David Buckel ("Buckel"), in his capacity as Chairman of the SouthPeak Audit Committee, that she believed that the Phillips Advance and the incorrect accounting treatment of both the Phillips Advance and the My Baby DS Inventory represented intentional efforts by Strachan and possibly others to overstate SouthPeak's profitability as reported on the 3/31 10Q and cover up Phillips' payment for the company.   Plaintiff also informed Buckel that in her professional opinion as a CPA, SouthPeak would be required to restate the results reported on the 3/31 10Q to correct the overstatement.  Plaintiff also explained to Buckel that her concerns were heightened by the knowledge that Phillips was the subject of an SEC investigation arising out of transactions between a company he controlled and a publicly traded company, and that at the time, Strachan was an employee of the same company or a related company reporting directly to Phillips.

45.     On or about June 8, 2009, Buckel contacted Mark Wishner, Esq. ("Wishner") of Greenberg Traurig (securities and corporate counsel to SouthPeak) and reported to him that Plaintiff had informed him of conduct that that she believed was a violation of 18 U.S.C. §§ 1341, 1343, 1344 or 1348, rules or regulations of the Securities and Exchange Commission, or provisions of federal law relating to fraud against shareholders (hereinafter "anti-fraud securities laws").  After Buckel spoke with Wishner, Buckel specifically instructed Plaintiff by telephone not to provide representatives of

SouthPeak's CPA firm, Reznick Group, PC, ("Reznick") with any information that they did not specifically request and to not use e-mail so that there would be limited documentation of the issues. These instructions from Buckel to Plaintiff were directives to violate anti-fraud securities laws requiring full and accurate disclosure of material information related to the financial condition, performance, and management of a publicly traded company.

46.     On or about June 22, 2009, Wishner and Greenberg Traurig attorney Mr. Chris Davis ("Mr. Davis") visited SouthPeak's office with the stated intent to conduct an investigation in response to Buckel's report. Wishner and Mr. Davis spoke with Plaintiff and, on information and belief, with Strachan, Hicks, Huyck, Bradford, and others.

47.     On June 30, 2009, Plaintiff received a call from Chris Mahon ("Mahon"), a CPA with Reznick, stating that he had received a report from Greenberg Traurig and was requesting information regarding an inventory adjustment that Reznick had been instructed to make in SouthPeak's financial reports. In response, Plaintiff sent Mahon several e-mails with information relating to the Phillips Advance.

48.     On July 1, 2009, Plaintiff received an e-mail from Ms. Kelly Davis ("Ms. Davis"), a senior financial analyst at SouthPeak, stating that she was experiencing difficulty getting Strachan to respond to her questions regarding accounts payable and accounts receivable procedures.

49.     In late June or early July, Remonde Brangman ("Brangman") and Jeffrey Manwiller ("Manwiller") from CBIZ Accounting, Tax & Advisory of Maryland, LLC, (Southpeak's recently engaged Sarbanes-Oxley compliance advisers) visited SouthPeak's offices. In a meeting with Brangman, Manwiller, and Ms. Davis, Plaintiff recounted the

details of the Phillips Advance, Strachan's instructions to Bradford, and the initiation of an investigation by Greenberg Traurig at the request of the Audit Committee. In that meeting, Brangman suggested that Plaintiff should consider retaining personal counsel. Brangman made this suggestion based on Plaintiff's earlier description of her efforts to investigate, report, and correct the aforementioned accounting irregularities. Plaintiff interpreted this advice, coming from an independent professional accountant charged with responsibility for SouthPeak's compliance with securities laws, as strong confirmation that her concerns were well-founded.

### Preparation of SouthPeak's 3/31 10-Q/A

50.     On July 15, 2009, Plaintiff received e-mail from Mahon requesting additional information relating to the Phillips Advance to enable Reznick to prepare an amended quarterly report ("3/31 10-Q/A"). Plaintiff provided the requested information.

51.     On July 20, 2009, Plaintiff received an e-mail from Caitlin Bast ("Bast"), SouthPeak's recently hired payables clerk, informing Plaintiff of certain accounts payable invoices that had not been properly recorded in the three-month period ending March 31, 2009 (the "Bast Payables").

52.     Prior to July 20, 2009, in its preparation of the 3/31 10-Q/A, Reznick representatives identified additional payables that should have been reported on the original 3/31 10-Q (the "Gamecock Payables").

53.     On or about July 20, 2009, SouthPeak staff accountant Jason Christansen ("Christansen") informed Plaintiff that Strachan told him that Avi Lipsker ("Lipsker"), a management consultant to Phillips and SouthPeak, had instructed Strachan not to tell

Christansen or Jones about the Gamecock Payables and not to record them on the books for the period ending March 31, 2009.

54.     On July 27, 2009, Plaintiff sent Mahon an e-mail detailing accounting adjustments for the My Baby DS Inventory, the Gamecock Payables, and the Bast Payables.

55.     The original 3/31 10-Q reflected a.  In reviewing the original 3/31 10-Q, Plaintiff determined that a calculation of accrued royalties for the My Baby DS product (the "My Baby DS Accrued Royalty Calculation") was not prepared on a consistent basis with similar calculations for prior periods and other products, and it overstated SouthPeak's profits for the relevant period.

56.     On July 28, 2009 Plaintiff spoke with Bast about questions raised by Reznick concerning SouthPeak's accounts payable procedures.  In that meeting, Bast informed Plaintiff that when she asked Strachan for instructions for recording invoices, including some relating to transactions prior to March 31, 2009, Strachan instructed her to enter them with the date of April 1, 2009, causing expenses for the period ending March 31, 2009 to be understated by the amount of those payables, in addition to the other misstatements discussed above.  Such an instruction from Strachan to Bast would constitute a prima facie violation of anti-fraud securities laws.  In this conversation, Plaintiff learned of additional payables (the "Additional Bast Payables") that had not been discovered by Reznick's procedures.

57.     Later on July 28, 2009, Plaintiff participated in a conference call requested by Mr. Davis with Phillips, Mroz, Lipsker, and Wishner to discuss the status of the 3/31 10-Q/A, in which Plaintiff described the booking of the accounts payable invoices in the

wrong period revealed to her by Bast earlier that day. Lipsker, Wishner and Phillips argued that the there was no basis for including the Additional Bast Payables on the 3/31 10-Q/A.

58.　　On July 31, 2009, Plaintiff received an e-mail from Mr. Davis in which he requested a copy of the adjustments that Plaintiff had sent to Mahon for the Gamecock Payables. Plaintiff provided the requested information.

59.　　On or before July 30, 2009, Plaintiff received a draft of the proposed 3/31 10-Q/A prepared by Greenberg Traurig. The draft included language stating that Greenberg Traurig's investigation disclosed no intentional wrongdoing by SouthPeak personnel in connection with the understatements of cost on the 3/31 10-Q .

60.　　On August 3, 2009, Plaintiff requested that Mr. Davis send her a copy of the report prepared by him and Wishner, summarizing the findings of their investigation (the "Greenberg Traurig Report"). Mr. Davis responded that he was not authorized to send her a copy.

61.　　On August 3, 2009, Plaintiff spoke with Mroz by telephone and expressed her concerns about the proposed 3/31 10-Q/A, stating: a) she could not properly assess the accuracy of its language without reviewing the Greenberg Traurig Report, b) in her professional opinion as a CPA, additional corrections would be required for the 3/31 10-Q/A to be accurate, and c) Buckel had instructed her not to provide representatives of Reznick with any information that they did not specifically request.

62.　　In a conference call on August 4, 2009, in which Wishner, Mr. Davis, Phillips, Mroz, and Lipsker also participated, Mahon asked Plaintiff if she was aware of any additional transactions that may not have been properly booked in the quarter ending

March 31, 2009 that had not been brought to Reznick's attention, and Plaintiff informed him of the Additional Bast Payables and of the My Baby DS Accrued Royalty Calculation. Plaintiff explained, in her professional opinion as a CPA, the 3/31 10-Q/A would materially misrepresent the actual costs of SouthPeak if it a) did not properly reflect the Additional Bast Payables and b) continued to reflect the incorrect My Baby Accrued Royalty Calculation. The combined effect of these two adjustments totaled approximately $480,000.

63.     Mahon probably would not have learned of the Additional Bast Payables or the My Baby DS Accrued Royalty Calculation if Plaintiff had not informed Mahon of such adjustments, and it is highly likely that the 3/31 10-Q/A would have omitted or misrepresented these transactions.

64.     On August 4, 2009, in response to a request by Mahon, Plaintiff e-mailed Mahon an example of an accrued royalty calculation documenting the accounting methodology used previously for royalty calculations on other products, and sent a copy to Lipsker by e-mail.

65.     On August 4th and 5th, 2009, Plaintiff engaged in numerous discussions with Lipsker regarding the appropriate calculation of the accrued royalties liability for the My Baby DS product. Lipsker argued that there should be no liability and accordingly would have reported higher profits than the calculation proposed by Plaintiff. Plaintiff believed the calculation reflected in the 3/31 10-Q was inconsistent with calculations for prior periods and understated true costs. Plaintiff insisted that her calculation was correct, and ultimately Lipsker relented. These discussions were highly contentious and at times heated.

66.     Based on her own investigations, her training and experience as a CPA in public accounting, and her numerous discussions with Wishner, Mr. Davis, Phillips, Strachan, Mroz, Hicks, Huyck, Lipsker, Bast, and Buckel, Plaintiff concluded that Strachan and possibly others intended to misstate the company's financial results for the period ending March 31, 2009 by actively concealing the Phillips Advance and SouthPeak's product costs paid for personally by Phillips thereby overstating profits for the first quarter of 2009 and by directing Bast to book aproximately $300,000 of expenses properly reportable in the quarter ending March 31, 2009 with a date of April 1, 2009, effectively moving those costs into the quarter ending June 30, 2009.

67.     But for Plaintiff's protected activity, SouthPeak either: a) would not have filed a 3/31 10-Q/A, or b) would have filed a 3/31 10-Q/A that continued to materially misrepresent the results of South Peak's operations for the relevant periods.

68.     Plaintiff believes in good faith that the understatements of product and other expenses on the original 3/31 10-Q reflect intentional efforts by Strachan and possibly others to portray the company as a better investment than it was in reality, at a time when it was seeking additional equity investments.

69.     Plaintiff requested a copy of the Greenberg Traurig Report but was denied the opportunity to review that report. Plaintiff believes in good faith that she was denied an opportunity to review the report of Greenberg Traurig because that report did not support the conclusion that there was no intentional wrongdoing on the part of employees of SouthPeak with respect to the 3/31 10-Q.

70.     Plaintiff informed Wishner that she would not sign the 3/31 10-Q/A, as drafted by Wishner and Mr. Davis, because, in her professional opinion as a CPA, the

16

underreporting of product costs and other expenses on the 3/31 10-Q was the direct result of intentional violations of anti-fraud securities laws.

71.    On August 13, 2009, Plaintiff e-mailed Manwiller her proposed language for the 3/31 10-Q/A, stating that the accounting misstatements on the 3/31 10-Q were the result of intentional wrongdoing in violation of rules and regulations of the SEC and provisions of federal laws relating to fraud against shareholders. Plaintiff was prepared to sign the 3/31 10-Q/A if her language was substituted for the language drafted by Wishner and Mr. Davis.

### Plaintiff's Unlawful Termination

72.    On August 12, 2009, Plaintiff, by counsel, notified the Enforcement Division of the SEC of the facts and circumstances described in the foregoing paragraphs, using the format of the online SEC Enforcement Complaint Form, stating that Plaintiff believed that the conduct of SouthPeak and certain of its officers, directors, and professional advisers may have violated anti-fraud securities laws.

73.    Between August 12, 2009 and August 14, 2009, Phillips, as Chairman and majority shareholder of SouthPeak, and Mroz, as President, CEO, and Director of SouthPeak, both decided to, or knew or had reason to know of the decision to, unlawfully terminate Plaintiff because Plaintiff provided information relating to alleged violations of anti-fraud securities laws by SouthPeak, Phillips, and others to the SEC.

74.    On August 14, 2009, Mroz and Josephsen jointly informed Plaintiff that SouthPeak was terminating her employment, effective immediately.

75.    Upon her termination, SouthPeak offered Plaintiff two weeks' salary or three months' salary if Plaintiff signed a confidentiality agreement, including, but not

limited to, an agreement not to speak with any employee of SouthPeak or any non-employee of SouthPeak and to employ SouthPeak legal representation in any interactions with the SEC. Plaintiff refused to sign the confidentiality agreement and, consequently, received two weeks' salary upon her termination.

76. On September 11, 2009, SouthPeak filed an amended quarterly report on Form 10-Q/A for the quarter ending March 31, 2009. The amended quarterly report generally included the revised language Plaintiff drafted, in which it disclosed Phillips' payment as a loan to the company and acknowledged material weaknesses in SouthPeak's internal controls.

### SEC Enforcement Actions Against SouthPeak

77. SouthPeak's 10k, filed on October 13, 2010, disclosed the following:

> On September 3, 2010, we, Terry Phillips, our chairman, and Melanie Mroz, our CEO, received Wells Notices from the staff of the Securities and Exchange Commission advising that the staff will recommend to the Securities and Exchange Commission that cease and desist orders issue for alleged violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Securities and Exchange Act and Rules 12b-20 and 13a-13 adopted under this act. In addition, the staff has alleged violations by Mr. Phillips and Ms. Mroz of Rule 13b-2 and Rule 13a-14 by Ms. Mroz. These alleged violations result from the facts underlying the need to file an amended Form 10Q/A for the fiscal quarter ended March 31, 2009.

78. On April 20, 2011, the SEC filed a complaint against Phillips in the United States District Court for the Eastern District of Virginia styled *Securities and Exchange Commission v. Terry M. Phillips*, Civil Action No. 1:11CV422 AJT/IDD (the "SEC Complaint"), alleging four claims against Phillips: aiding and abetting violations of Exchange Act Section 13(a) and Rules 12b-20 and 13a-13 thereunder; aiding and abetting violations of Exchange Act Section 13(b)(2)(A); aiding and abetting violations of Exchange Act Section 13(b)(2)(B); and violations of Rule 13b2-2 of the Exchange Act.

See attached SEC Complaint labeled Exhibit "A" (eight pages). The SEC Complaint propounds the factual allegations of which Plaintiff notified the SEC on August 12, 2009. See SEC Complaint, paragraphs 12-20.

79.    On or about April 21, 2011, Phillips consented to the entry of a permanent injunction against future violations of these provisions and a court order directing Phillips to pay a $50,000 civil penalty.

80.    On or about April 21, 2011, the SEC issued cease-and-desist orders against SouthPeak and Strachan. SouthPeak consented to the issuance an order requiring SouthPeak to cease and desist from committing or causing any violations and any future violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20 and 13a-13 thereunder. In addition, Strachan consented to the issuance of an order finding that Strachan failed to ensure that Phillips' payment was properly recorded in SouthPeak's books and records, that Strachan instructed her subordinate not to inform the chief financial officer (Plaintiff) that Phillips had made the payment with his personal funds, and that Strachan made false material statements in an interview with SouthPeak's auditor. The order requires Strachan to cease and desist from causing any violations and any future violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, and Rules 12b-20 and 13a-13 thereunder, and committing or causing any violations and any future violations of Rule 13b2-2 thereunder and pay a $10,000 civil penalty.

81.    On or about September 15, 2011, SouthPeak filed a certification and notice of termination of registration under Section 12(g) of the Securities Exchange Act of 1934 or suspension of duty to file reports under Sections 13 and 15(d) of the Securities Exchange Act of 1934.

## STATEMENT OF CLAIMS

### COUNT I:
### SARBANES-OXLEY WHISTLEBLOWER PROTECTION – 18 U.S.C. § 1514A

82.     Plaintiff incorporates by reference and realleges each allegation set forth above.

83.     The Sarbanes-Oxley Act, 18 U.S.C. § 1514A, prohibits any company with a class of securities registered under § 12 of the Securities Exchange Act of 1934, or required to file reports under §15(d) of the same Act, or any officer, employee or agent of such company, from discharging, harassing, or in any manner discriminating against an employee in the terms and conditions of employment because the employee provided information relating to alleged violations of 18 U.S.C. §§ 1341, 1343, 1344 or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of federal law relating to fraud against shareholders.

84.     Before and at the time of Plaintiff's termination, SouthPeak was a publicly-traded company with a class of securities registered under § 12 of the Securities Exchange Act. SouthPeak is therefore subject to the Sarbanes-Oxley Act.

85.     Plaintiff engaged in protected activities as defined in 18 U.S.C. § 1514A by providing information to regulatory and enforcement agencies (the SEC) and persons with supervisory authority over her about the accounting misstatements on SouthPeak's March 31, 2009 Form 10-Q and the subsequent conduct of certain of its officers, directors, agents, and professional advisers which she believed in good faith constituted violations or attempted violations of 18 U.S.C. §§ 1341, 1343, 1344 or 1348, various rules and regulations of the Securities and Exchange Commission, and provisions of federal law relating to fraud against shareholders.

20

86.     Between August 12, 2009 and August 14, 2009, Phillips, as Chairman and majority shareholder of SouthPeak, and Mroz, as President, CEO, and Director of SouthPeak, both decided to, or knew or had reason to know of the decision to, unlawfully terminate Plaintiff because Plaintiff provided information and/or made disclosures to the SEC relating to alleged violations of anti-fraud securities laws by SouthPeak, Phillips, Mroz, and others.

87.     As a result of her protected activities under the Act, on August 14, 2009, Plaintiff was unlawfully terminated, an adverse employment action prohibited by the Act.

**COUNT II:**
**VIOLATION OF DODD-FRANK WHISTLEBLOWER STATUTE**
**15 U.S.C. § 78u-6**

88.     Plaintiff incorporates by reference and realleges each allegation set forth above.

89.     The Dodd-Frank Act, 15 U.S.C. § 78u-6(h)(1)(A), prohibits employers from discharging or discriminating against a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower in providing information to the SEC or in making disclosures that are required or protected under the Sarbanes-Oxley Act and any other law, rule, or regulation subject to the jurisdiction of the SEC.

90.     The Dodd-Frank Act defines a "whistleblower" as "any individual who provides, or 2 or more individuals acting jointly who provide, information relating to a violation of the securities laws to the Commission, in a manner established, by rule or regulation, by the Commission." 15 U.S.C. § 78u-6(a)(6).

91.     Plaintiff is a whistleblower under the Dodd-Frank Act because Plaintiff, by counsel, reported information to the Commission, using the format of the online SEC Enforcement Complaint Form, relating to a violation of the Sarbanes-Oxley Act on August 12, 2009.

92.     Plaintiff's disclosures to the Commission regarding the Defendants' actions were protected by Section 806 of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A and/or other rules and regulations of the SEC.

93.     On August 14, 2009, Defendants discharged Plaintiff because of Plaintiff's lawful act in providing information to the Commission  Between August 12, 2009 and August 14, 2009, Phillips, as Chairman and majority shareholder of SouthPeak, and Mroz, as President, CEO, and Director of SouthPeak, both decided to, or knew or had reason to know of the decision to, unlawfully terminate Plaintiff because Plaintiff provided information and/or in making disclosures to the SEC that are required or protected under the Sarbanes-Oxley Act relating to alleged violations of anti-fraud securities laws by SouthPeak, Phillips, Mroz, and others.

94.     As a result of her protected activities under the Act, on August 14, 2009, Plaintiff was unlawfully terminated, an adverse employment action prohibited by the Act.

## COUNT III:
## BREACH OF ADDITIONAL CONSIDERATION CONTRACT

95.     Plaintiff incorporates by reference and realleges each allegation set forth above.

96.     Plaintiff received a base salary of approximately $105,000 per year at SouthPeak.

97.     On or about late 2007 or early 2008, Plaintiff received approximately $31,855 of additional compensation paid for work related to the preparation of financial reports and securities filings.

98.     On or about December 25, 2007, Plaintiff received a cash bonus of $4,375 as a "Christmas bonus."

99.     On July 1, 2008, Plaintiff received stock options and restricted stock from SouthPeak as additional compensation and/or a bonus.  Plaintiff received approximately 5,500 shares of restricted stock valued at $2.30 per share for a total of approximately $12,650.  Plaintiff also received stock options valued at approximately $52,800.

100.    On December 31, 2008, Plaintiff received an additional 10,000 stock option shares valued at approximately $7,200.  In addition, on or about that day, Plaintiff received a cash bonus of $4,375 as a "Christmas bonus."

101.    On July 1, 2009, one third of the stock options Plaintiff received on July 1, 2008, vested.  Plaintiff never exercised these stock options.

102.    On or about January 2009, a recruiter from Atlanta approached Plaintiff for preliminary discussions for a position as chief financial officer for a clean energy company that wanted to expand operations.  Plaintiff did not pursue the opportunity because of the success of SouthPeak at the time, the compensation Plaintiff received, and the anticipated and/or promised receipt of further stock options and restricted stock.

103.    On or about June or July 2009, Phillips told Plaintiff that SouthPeak planned to award employees additional stock options and restricted stock.

104.    For 2009, Plaintiff anticipated and/or was promised a similar substantial bonus in the form of stock options, restricted stock, and a Christmas bonus as

consideration to specifically retain Plaintiff's services and/or to induce Plaintiff to forgo other employment opportunities. Defendants offered Plaintiff the bonus to procure efficient and faithful service and continuous employment.

105.     The bonus promised to Plaintiff by Defendants as a substantial additional consideration for Plaintiff's services creates a valid and enforceable contract between Plaintiff and Defendants. Plaintiff's continued service to Defendants upon the inducement of the cash bonus creates a supplementary contract of which Plaintiff cannot be deprived without sufficient cause.

106.     On August 14, 2009, Defendants dismissed Plaintiff without sufficient and/or just cause. Defendants' dismissal of Plaintiff without sufficient and/or just cause was a breach of contract.

107.     As a result of Defendants' termination of Plaintiff without sufficient and/or just cause due to Plaintiff's lawful act in providing information to the Commission and/or in making disclosures that are required or protected under the Sarbanes-Oxley Act, Plaintiff was forced to forfeit the one third of unexercised, vested stock options received on July 1, 2008, totaling approximately $17,600, the remaining two thirds of unvested stock options received on July 1, 2008, totaling approximately $35,200, and the unvested stock options received on December 31, 2008, totaling approximately $7,200, and Plaintiff did not receive stock options and/or restricted stock for 2009, nor did Plaintiff receive the Christmas bonus in 2009, in consideration to specifically retain Plaintiff's services and/or to induce Plaintiff to forgo other employment opportunities.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court:

A.      Order that she be reinstated or constructively reinstated to her former position, with the same seniority status that she would have had but for the discrimination and enjoin the Defendants from further retaliation against her;

B.      Award her two times all back pay and benefits, including salary increases, bonuses, stock options, vacation pay and health insurance, with interest on same running from August 14, 2009 until the date a final judgment enters for her;

C.      Award her front pay and reputational damages in an amount up to $500,000.00 to be proved at trial, to compensate her for the loss of income and earning capacity that Defendants' conduct has caused;

D.      Award her money damages for the emotional distress caused by the unlawful actions of the Defendants;

E.      Award compensation for all special damages sustained as a result of the Defendants' actions, including litigation costs, expert witness fees and reasonable attorneys' fees;

F.      Award her damages in the amount $60,000 for her forfeited stock options received on July 1, 2008 and December 31, 2008, and damages for the stock options and/or restricted stock and the Christmas bonus Plaintiff did not receive for the 2009 fiscal year, with interest on same running from August 14, 2009 until the date a final judgment enters for her; and

G.      Award all other relief the Court deems necessary to make her whole.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

Respectfully submitted,

James B. Thorsen
VSB No. 18113
Attorney for Andrea Gail Jones
MARCHANT, THORSEN, HONEY,
BALDWIN & MEYER, LLP
5600 Grove Avenue
Richmond, VA  23226
(804) 285-3888
Fax (804) 285-7779
jim@mthblaw.com