

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ANDREA GAIL JONES,

    Plaintiff,

v.                          Civil Action No. 3:12cv443

SOUTHPEAK INTERACTIVE
CORPORATION OF DELAWARE,
et al.,

    Defendants.

## MEMORANDUM OPINION

This matter is before the Court on PLAINTIFF'S PETITION FOR ATTORNEYS' FEES AND COSTS (Docket No. 184). For the reasons set forth below, the motion will be granted in part and denied in part.

## PROCEDURAL AND FACTUAL BACKGROUND

This action arose out of Andrea Jones' ("Jones") tenure and termination as Chief Financial Officer of SouthPeak Interactive Corporation of Delaware ("SouthPeak"). Terry M. Phillips ("Phillips") was Chairman of the Board of SouthPeak, and Melanie J. Mroz ("Mroz") was the President, Chief Executive Officer, and a Director of SouthPeak. The procedural and factual background is set forth in the Memorandum Opinions filed on October 29, 2013 (Docket No. 169), October 30, 2013 (Docket No. 171), and

November 19, 2013 (Docket No. 177), and is incorporated herein by reference.

In essence, Jones presented three claims in this action. Count I was a claim under the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A(c)(2)(C). Count II was a claim under the Dodd-Frank Act, 15 U.S.C. 78u-6(h)(1)(A). Count III was a breach of contract action alleging that, as a result of her unlawful termination, Jones was deprived of certain stock options. The Court granted the motion to dismiss Count II. Jones withdrew Count III. The case went to trial on Count I and a jury returned a verdict in favor of Jones against all three defendants. As a result of post-trial motions and a remittitur, judgment was entered as follows:

> $470,000.00 back pay with interest against SouthPeak Interactive Corporation
>
> $123,000.00 compensatory damages with interest against SouthPeak Interactive Corporation
>
> $50,000.00 compensatory damages with interest against Terry M. Phillilps
>
> $50,000.00 compensatory damages with interest against Melanie J. Mroz

As the prevailing party, Jones now seeks attorneys' fees and costs. After reviewing the original fee petition and the supporting and opposing briefs, the Court held, by Order of March 5, 2014 (Docket No. 188), that there was no dispute that

Jones was a prevailing party or that she was entitled to costs and reasonable attorneys' fees. Therefore, Jones was awarded costs in the amount of $22,880.56 against SouthPeak, Phillips, and Mroz, jointly and severally. At the same time, the parties were required to file supplemental briefs addressing specific aspects of the requested attorneys' fees.

## LEGAL STANDARD

The Sarbanes-Oxley Act of 2002 provides that relief for a prevailing employee "shall include . . . compensation for any special damages sustained as a result of the discrimination, including litigation costs, expert witness fees, and reasonable attorney fees." 18 U.S.C. § 1514A(c)(2)(C). As the fee applicant under a prevailing party fee statute, Jones has the burden of demonstrating the reasonableness of the fee requested. Hensley v. Eckerhart, 461 U.S. 424, 437 (1983). The amount of the award should be "adequate to attract competent counsel, but not produce windfalls to attorneys." City of Riverside v. Rivera, 477 U.S. 561, 580 (1986) (internal quotations and citations omitted).

The "initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." Blum v. Stenson, 465 U.S. 886, 888 (1984). This approach

3

to setting fees is commonly referred to as the "lodestar approach." In Perdue v. Kenny A., 559 U.S. 542, 551 (2010), the Supreme Court held that the lodestar approach has "achieved dominance in the federal courts" (citations and quotations omitted). As explained in Project Vote/Voting for America, Inc. v. Long, 887 F. Supp. 2d 704, 709 (E.D. Va. 2012)(internal citations omitted), the lodestar amount "results from multiplying 'the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" Hours that were not "reasonably expended" must necessarily be excluded; and, to that end, "[c]ounsel . . . should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." Hensley, 461 U.S. at 434. Of course, time devoted to any claims on which the applicant did not prevail must be excluded from the calculation.

There is a "strong presumption that the lodestar figure . . . represents a reasonable fee." Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 565 (1986). In Perdue, the Supreme Court made clear that the strong presumption for the reasonableness of a lodestar fee figure can only rarely be overcome, 559 U.S. at 554, and then in "extraordinary cases [that] are presented only in the rarest circumstances." Id. at 560 (Kennedy, J., concurring); see also id. at 561 (Thomas, J., concurring).

4

In explaining its preference for the lodestar figure as a reasonable fee, the Supreme Court considered two alternatives: (1) the twelve-factor test stated by the Fifth Circuit in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974), and (2) the lodestar method stated by the Third Circuit in Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp., 487 F.2d 161 (3d Cir. 1973); appeal after remand, 540 F.2d 102 (3d Cir. 1976). As to the Johnson twelve-factor test, the Supreme Court concluded: "This method, however, gave very little actual guidance to district courts. Setting attorney's fees by reference to sometimes subjective factors placed unlimited discretion in trial judges and produced disparate results." Perdue, 559 U.S. at 551 (internal quotation and citation omitted). To explain its preference for the lodestar method of determining a reasonable fee, the Supreme Court stated:

> Although the lodestar method is not perfect, it has several important virtues. First, in accordance with our understanding of the aim of fee-shifting statutes, the lodestar looks to the prevailing market rates in the relevant community. Developed after the practice of hourly billing had become widespread, the lodestar method produces an award that roughly approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case. Second, the lodestar method is readily administrable, and unlike the Johnson approach, the lodestar calculation

5

> is 'objective,' and thus cabins the
> discretion of trial judges, permits
> meaningful judicial review, and produces
> reasonably predictable results.

Id. at 551-52 (internal quotations and citations omitted,

emphasis in original and added).[1]

Thus, in effect, the Supreme Court in Perdue relegated the

Johnson twelve-factor approach to the sidelines in fee analysis.

The Fourth Circuit has not directly confronted the impact of

Perdue on the Johnson approach, but other courts of appeal have.

For example, in Black v. SettlePou, P.C., 732 F.3d 492, 502 (5th

Cir. 2013), the court held that "[t]he lodestar may not be

adjusted due to a Johnson factor that was already taken into

account during the initial calculation of the lodestar."   In

Millea v. Metro-North Railroad Co., 658 F.3d 154, 167 (2d Cir.

2011), the Second Circuit held that "a court may not adjust the

lodestar based on factors already included in the lodestar

calculation itself because doing so effectively double-counts

those factors." In Anchondo v. Anderson, Crenshaw & Associates,

L.L.C., 616 F.3d 1098, 1103 (10th Cir. 2010), the Tenth Circuit

concluded that Perdue "appears to significantly marginalize the

---

[1] The Court notes that today law firms increasingly rely on so-
called "alternative billing" arrangements when providing
litigation, and indeed other services. See Rachel M. Zahorsky,
Facing the Alternative, 98 A.B.A.J. 40 (Mar. 2012).   Whether
that will necessitate a change in the lodestar mode of fee
analysis is uncertain, but that issue is not presented in this
case.

twelve-factor Johnson analysis."

In McAfee v. Boczar, 738 F.3d 81, 88-95 (4th Cir. 2013), the Fourth Circuit indicated some doubt whether that is the effect of Perdue, but did not find it necessary to decide the issue. However, the text and the holding of Perdue do not leave much room for doubt, as the Second, Fifth and Tenth Circuits have held. Considering those decisions interpreting the Supreme Court's decision in Perdue, this Court must follow the directives of Perdue. That means that the lodestar method is presumed to create a reasonable fee. Of course, there are four of the Johnson factors that are not subsumed in either multiplier in the lodestar approach. Factor 8 (the amount in controversy) and Factor 12 (attorneys' fees in similar cases) are the only two factors that, on the record here, could come into play in this case. And, they are considered in the context that the parties have presented them.

## DISCUSSION

Jones originally sought an award of attorney's fees in the amount of $406,851.00. Pl. Pet. for Att'ys' Fees and Costs (Docket No. 184). In her supplemental petition, she revised the amount sought to $404,593.80. Pl. Supp'l Pet. for Att'ys' Fees (Docket No. 190) at 8. Defendants remain of the view that that the fee request is not reasonable and is not supported by

reliable billing records. Defs. Supp'l Opp. (Docket No. 191) at 2.

## A.   Reasonable Rate

"[D]etermination of the hourly rate will generally be the critical inquiry in setting the 'reasonable fee,' and the burden rests with the fee applicant to establish the reasonableness of a requested rate." Plyler v. Evatt, 902 F.2d 273, 277 (4th Cir. 1990).   The appropriate hourly rate is generally to be determined by applying the "prevailing market rates in the relevant community for the type of work for which [the party] seeks an award." Spell v. McDaniel, 824 F.2d 1380, 1402 (4th Cir. 1987); see also Rum Creek Coal Sales v. Caperton, 31 F.3d 169, 175 (4th Cir. 1994) ("The relevant market for determining the prevailing rate is ordinarily the community in which the court where the action is prosecuted sits."); Nat'l Wildlife Federation v. Hanson, 859 F.2d 313, 317 (4th Cir. 1988) ("The community in which the court sits is the appropriate starting point for selecting the proper rate.").

> The prevailing market rate may be established through affidavits reciting the precise fees that counsel with similar qualifications have received in comparable cases; information concerning recent fee awards by courts in comparable cases; and specific evidence of counsel's actual billing practice or other evidence of the actual rates which counsel can command in the market.

Spell, 824 F.2d at 1402.

### 1.  Sands Anderson PC Rates

Jones was represented initially, from approximately July 2009 until February 2012, by attorneys at the firm of Sands Anderson PC.  The services provided by those attorneys related to exhausting Jones' administrative remedies under the Sarbanes-Oxley Act and trying to settle Jones' claim.  The rate claimed for the senior attorneys from Sands Anderson who represented Jones is $300.00 per hour.  The Defendants do not contest the reasonableness of that rate.

### 2.  Marchant, Thorsen, Honey, Baldwin & Meyer LLP Rates

Jones was represented by James B. Thorsen and Jesse A. Roche.  Thorsen is a partner in the firm of Marchant, Thorsen, Honey, Baldwin & Meyer, LLP.  Roche is an associate in the firm.

Jones posits rates for Thorsen and Roche that she says are the market rates in Richmond, Virginia for similar services.  Thorsen Aff. ¶ 9; Roche Aff. ¶ 5.  In support of her view that these hourly rates, $425 for Thorsen and $250 for Roche, reflect the market rates in the community, Jones provides the affidavit of Thorsen, who served as lead counsel in this action; the affidavit of Roche, who assisted Thorsen; and the affidavits of two attorneys not associated with the case: Harris D. Butler, III, a fellow of the American College of Trial Lawyers, and Craig J. Curwood, both of whom are experienced and respected

9

practicing attorneys in the Richmond market. Exhibits 1-4, Pl. Pet. for Att'ys' Fees and Costs (Docket No. 184).

In his affidavit, Thorsen notes that he was awarded fees based on an hourly rate of $375 per hour by a judge of this court in a Title VII race discrimination case in November 2008, almost five years before the jury trial in this case. Thorsen Aff. ¶ 2. After reviewing the case record, surveying the local legal market, and taking into account his experience in the Richmond market, Butler determined that the rates charged by Thorsen and Roche are "reasonable and represent[] the prevailing market rate for (or even under the rates charged by) similarly skilled attorneys in similar work and cases practicing law in the Richmond, Virginia metropolitan community." Butler Aff. ¶ 8. Butler also explained that "[t]he rate of $425.00 is actually less than the rate that is charged by most experienced counsel in the defense of employment cases and against whom experienced plaintiffs' employment litigation counsel, such as Mr. Thorsen, regularly litigate." Id. ¶ 9. Curwood averred that the rate posited for Roche "is a reasonable rate for an attorney with two years of experience in the Richmond legal marketplace;" that the rate claimed by Thorsen "is below the rate commanded by other attorneys in Richmond with similar skill and experience;" and that the prevailing market rate in Richmond for an attorney of

Thorsen's caliber is in the $475-$600 range. Curwood Aff. ¶¶ 8-10.

The customary rate is to be determined by looking at what an attorney earns "for similar services in similar circumstances." Rum Creek Coal Sales, Inc., 31 F.3d at 175. Citing decisions from the Fourth Circuit and this Court, Jones contends that both courts have recognized market rates ranging from $380 to nearly $600 for lead counsel and $225 to $450 for associate counsel in the Richmond market for services in complex civil litigation, which describes this case according to Butler and Curwood. Pl. Mem. Supp. (Docket No. 185) at 7-8. A 2013 report by TyMetrix Legal Analytics found a median hourly rate of $543 in 2012 for partners with more than twenty-one years of experience in Richmond. The same report found a median hourly rate of $257.50 in 2012 for associates with fewer than three years of experience. Id. at 8.

The Defendants raise several objections to a billing rate of $425.00 per hour for Thorsen, contending instead that a rate of $375.00 per hour is reasonable for his services. Each argument will be considered in turn.

First, the Defendants complain that Thorsen failed to "attach to his affidavit copies of the actual invoices he generated and/or submitted to Jones, copies of his original timesheets, [or] confirmation on what he normally bills (and

collects) for employment or other matters . . . ."  SOUTHPEAK DEFENDANTS' OPPOSITION TO PETITION FOR ATTORNEY'S FEES AND COSTS (Docket No. 186) at 5 ("Defs. Opp. (Docket No. 186)").  The same refrain is repeated later in the Defendants' summation about the topic of the appropriate rate. Id. at 9.  The argument is not well-developed, but the Court understands it to mean that the fee application is deficient because it does not provide "specific evidence of [Thorsen's] actual billing practice or other evidence of the actual rates which [Thorsen] can command in the market." Spell, 824 F.2d at 1402.  That, of course, is one way to establish market rates. Id.  However, it is not the only way; and it is also true that "the reasonable rate must be assessed distinctly from the typical rates of the counsel involved, regardless of whether those rates are higher or lower than the market rates." McAfee v. Boczar, 906 F. Supp. 2d 484, 494 (E.D. Va. 2012), aff'd in part, vacated in part, 738 F.3d 82 (4th Cir. 2013).  Nonetheless, it is "appropriate to consider the rate which the prevailing party's counsel usually commands and is paid in the relevant market." Id. at 494; Spell, 824 F.2d at 1402.  That, of course, is because "the rates charged in private representations may afford relevant comparisons." McAfee, 906 F. Supp. 2d at 494 (quoting Blum v. Stenson, 465 U.S. at 896 n.11).

The Defendants are correct that Thorsen did not provide evidence of the rates that Jones was billed or evidence of what rate she actually paid (if she paid anything).   In any event, what Jones paid or was obligated to pay Thorsen is of marginal utility in determining the market rates given the fact that the evidence at trial showed that Jones was financially devastated for a considerable period of time after having lost her job.

It also is true that the fee application in this case does not contain any evidence of what Thorsen normally bills and collects for employment matters or other similar litigation. However, because evidence of that sort is but one of the ways that a market rate can be determined, the absence of that information does not preclude a determination of a market rate given the other information in the record on that topic.   Here, the record contains affidavits of "local lawyers who are familiar both with the skills of the fee applicants and more generally with the type of work in the relevant community." McAfee, 738 F.3d at 91.   And, that is evidence that is "competent to show prevailing market rates. . . ."   Id.

Second, the Defendants complain that Thorsen has not produced "a copy of the contingency fee arrangement executed by Jones."   Defs. Opp. (Docket No. 186) at 5; see also id. at 9. However, it is settled that a contingent fee agreement does not

13

preclude an assessment of rates under prevailing party statutes. Blanchard v. Bergeron, 489 U.S. 87 (1989).

Third, the Defendants support their view that $375.00 per hour is a reasonable rate for Thorsen by offering evidence from other cases. For instance, they point to an affidavit that was filed in the Project Vote case. That information is not particularly probative because it is from a different market, specifically the Norfolk Division of this Court, and the market rates for legal services in the Norfolk Division are different from the market rates for legal services in the Richmond Division. Moreover, the rates involved in Project Vote span a period of time several years before the fees incurred in this case. For those reasons, the affidavit respecting attorney's fees in Project Vote is not of particular use in assessing the reasonableness of the rates in this case.

Fourth, the Defendants take the view that the Fourth Circuit "recently observed that rates of $365.00 and $585.00 per hour 'appear excessive to almost any lay observer' and 'some members of the judiciary would deem them exorbitant.'" Defs. Opp. (Docket No. 186) at 8 (citing McAfee, 738 F.3d at 91). According to the Defendants, in making those observations, the Fourth Circuit "sent a message that district courts should be mindful of what can and should be considered a reasonable rate for purposes of fee awards." Defs. Opp. (Docket No. 186) at 9.

14

With respect to the rates in McAfee (lead counsel $585.00 per hour; senior associate $365.00 per hour), the Fourth Circuit did state that, "[a]lthough these rates would appear excessive to almost any lay observer, and some members of the judiciary would deem them exorbitant," the Court also held that "the district court's findings to the contrary are entitled to our deference." McAfee, 738 F.3d at 91.   And, the Court of Appeals did not disturb the findings of the district court that the requested hourly rates were reasonable.

More importantly, the rule established by the Supreme Court and the Fourth Circuit is that the fee rates must be based on market rates in the area where the service is performed and, whether considered excessive by lay observers or deemed exorbitant by some members of the judiciary, the proofs in McAfee clearly brought the rates used within the market rates. And, nothing in McAfee suggests that the Fourth Circuit is prepared to depart from the market rate predicate for the determination of reasonableness of rates, a predicate set long ago by the Supreme Court and followed consistently thereafter by the Fourth Circuit.   Accordingly, the Defendants' argument based on the quotation from the Fourth Circuit's McAfee decision lacks merit.

The Defendants offered no contemporary evidence of the market rates in the Richmond Division for services of like kind

15

in like litigation.   On the other hand, Jones offered the affidavits of two established lawyers who are familiar with Thorsen and with the market rates in this area for litigation of this type.  As McAfee makes clear, the evidence that the Fourth Circuit has "deemed competent to show prevailing market rates includes 'affidavits of other local lawyers who are familiar both with the skills of the fee applicants and more generally with the type of work in the relevant community.'"  McAfee, 738 F.3d at 91 (citing Robinson v. Equifax Info. Servs., LLC, 560 F.3d 235, 245 (4th Cir. 2009)).

As Jones contends, Butler states that the rate structure of $425.00 per hour for Thorsen and $250.00 per hour for Roche is "reasonable and represents the prevailing market rate for (or even under the rates charged by) similarly skilled attorneys in similar work and cases practicing law in the Richmond, Virginia metropolitan community and beyond in which this Court sits." Butler Aff. ¶ 8.  However, later in the affidavit, Butler also states that his own current hourly rate is $420.00 per hour and that his law partner's rate is $375.00 per hour, which he described as a rate structure that is "based on the current market rates for [the] Richmond, Virginia market."  Id. ¶ 5. Therefore, as the Defendants suggest, the Butler affidavit is internally inconsistent.  Moreover, Butler is one of the most experienced and able lawyers in the Richmond, Virginia area in

16

cases of this sort.  He is a member of a number of professional associations, the best known of which is the American College of Trial Lawyers, and he has served as Chair of the Virginia Bar Association's Law Practice Management Section and Chair of the Employment Section of the Virginia Trial Lawyers Association. Although Thorsen's skills are substantial, as demonstrated by his success in this and other cases that are cited in his affidavit, the Court cannot conclude that his services should be compensated at a rate greater than Butler's.  Taking that into account, and considering the record as a whole, the Court concludes that an appropriate rate for Thorsen is $420.00 per hour.

Jones has presented evidence showing that the rate charged for the associate who worked on the case with Thorsen, Jesse Roche, should be $250.00 per hour based on market rates.  The Defendants take the view that the appropriate rate for Roche is $200.00 per hour based on the disclosures made by Jones under Fed. R. Civ. P. 26 which reveal that Roche billed his time in this matter at the rate of $200.00 per hour.  That, of course, is probative of the market rate, but it is not dispositive on the point.  The Butler affidavit shows that the $250.00 rate is between the market rates of $225.00 and $275.00 per hour for an associate for work of this kind in the Richmond market. Curwood's affidavit recites that the $250.00 rate for Roche is

"a reasonable rate for an attorney with two years of experience in the Richmond marketplace." Curwood Aff. ¶ 10.   And, the market survey places this figure within the market rate.   Taken as a whole, the record establishes that the rate of $250.00 per hour for Roche in this case is within the market rate and is a reasonable rate, notwithstanding that the firm billed Jones a lesser rate ($200.00 per hour) given her distressed financial circumstances.

## B.   Reasonable Hours

### 1.   Sands Anderson PC

Jones seeks attorneys' fees for 201.3 hours of services provided by Sands Anderson.   That firm represented Jones principally with respect to the Sarbanes-Oxley whistleblower protection issue.   Geiger Aff., ¶ 6 (Exhibit 5, Pl. Pet. for Att'ys' Fees and Costs (Docket No. 184)).   Although Sands Anderson gave some consideration to the Dodd-Frank claim (Count II), Geiger points out that the Sarbanes-Oxley Act and the Dodd-Frank Act are similar and largely non-exclusive.   Nonetheless, he excluded hours for any work done other than in connection with the claim asserted under the Sarbanes-Oxley Act.   In essence, Sands Anderson represented Jones before this action began and through the administrative process that is mandatory under the Sarbanes-Oxley Act.   The total amount of hours of services provided was 262.7 hours.   Geiger Aff., ¶ 11; Thorsen

18

Aff., ¶ 7.   Using billing discretion, Sands Anderson did not seek fees for three of the lawyers of the firm, plus Geiger, and one legal assistant who worked on the case.   Geiger Aff., ¶ 10. That was done "to remove any concern as to a duplication of efforts, understanding that such efforts included work on strategy, research and drafting." Id.  Considering all fee reductions, the Sands Anderson fee was reduced by 61.4 hours, or 23% of the total number of hours recorded in accord with the firm's standard billing practices.

The Defendants object to the time claimed for the Sands Anderson lawyers principally because it reflects an entry respecting the drafting of a memorandum to the firm's Executive Committee and because "nearly every time entry has been improperly 'blocked billed.'"   Defs. Opp. (Docket No. 186) at 12.   These perceived defects, say the Defendants, call the entirety of Sands Anderson's fees into question.   The Defendants also object to the time entries because there were 34.8 hours devoted in 2010 to the drafting of a complaint which, according to the Defendants, "is duplicative if not unnecessary, as Thorsen's and Roche's timesheets reflect that they drafted and filed the Complaint." Defs. Opp. (Docket No. 186) at 13.

Jones responds to those objections by asserting that the reduction of 23% made by Sands Anderson encompasses the matters about which the Defendants complain.   That is correct except

19

with respect to the objection made by the Defendants about
"block billing."   That circumstance is not cured by the
deduction of 23% previously applied by Sands Anderson.

The term "block billing" is generally defined as "grouping,
or lumping, several tasks together under a single entry, without
specifying the amount of time spent on each particular task."
Guidry v. Clare, 442 F. Supp. 2d 282, 294 (E.D. Va. 2006).
Block billing makes it difficult to ascertain how much time was
spent on each task for which a fee is requested.   And, in
general, the practice of "block billing" has been generally
disfavored in federal courts across the country and has often
led to a reduction in attorney's fees.   McAfee, 906 F. Supp. 2d
at 498.   The traditional remedy for block billing is to reduce
the fee by a fixed percentage reduction.   The percentage is
based on the trial court's familiarity with the case, its
complexity, and the counsel involved.   Project Vote, 887 F.
Supp. 2d at 717; Guidry, 442 F. Supp. 2d at 294.   That approach
provides a reasonable way to deal with the block billing
reflected in the Sands Anderson's billing records.   Accordingly,
the Court will apply a 10% across-the-board reduction to account
for the block billing in Sands Anderson's records.[2]

---

[2]   The Defendants' objection about time spent on drafting a
complaint is not well-taken.   The mere fact that Thorsen
subsequently drafted another complaint does not render
unreasonable the time spent by Sands Anderson drafting a

### 2.   Marchant, Thorsen, Honey, Baldwin & Meyer, LLP

Originally, Jones sought fees for 541.82 hours of work by Thorsen and 464.75 hours of work by Roche.   Those totals have been reduced to 539.45 hours of work by Thorsen and 459.75 hours of work by Roche. Thorsen Aff. ¶ 7; Pl. Supp'l Pet. for Att'ys' Fees (Docket No. 190), at 6 n.5.

To support these requests, Jones has submitted several exhibits.   First, Jones offered Exhibit A to Pl. Pet. for Att'ys' Fees and Costs (Docket No. 184-6), a billing statement that itemizes the work performed by Thorsen and Roche, divided into various categories.   It also identifies the date on which the work was performed, the attorney who performed the work, the amount of time, and describes the work performed.

Also, as directed by the Court in its March 5 Order, the initial submissions have been augmented by a supplemental petition with Exhibits A, B, C and D (Docket No. 190).   Exhibit A (Docket No. 190-1) shows the time spent organized into various categories as directed by the Court to facilitate an evaluation of the reasonableness of the hours expended.

---

complaint several years earlier.   It is clear from the time records that the drafting of the complaint served as a vehicle for an effective presentation of the plaintiff's claims in respect of settlement negotiations and in connection with other work done by Sands Anderson.   Under the circumstances, it is not unreasonable for Sands Anderson to have drafted a complaint, and the time charged in pursuit of that task is time reasonably charged to the Defendants.

For the most part, the Defendants' objections to the original fee petition and to the supplement are the same. Each will be considered in turn.

First, the Defendants contend that Jones has made no adjustment for time devoted to claims on which she did not prevail. In Jones' initial petition, counsel represented that a good faith effort had been made to exclude time devoted to claims upon which Jones did not prevail, specifically Counts II and III. The Defendants complained about the lack of evidence identifying the deduction for time attributed to unsuccessful claims. Accordingly, the Court required Jones to supplement its petition and to explain the deductions.

Jones responded to that instruction by submitting a revised Exhibit A to her supplemental filing (Docket No. 190-1), as well as an Exhibit B. Therein, Jones showed that a deduction of 27.8 hours had been made for time devoted to unsuccessful claims. The Defendants' position is that "a review of the time sheets as a whole reveals that there has been no real effort to reduce or redact the time sheets to reflect or even approximate how much time was spent on unsuccessful claims." Defs. Supp'l Opp. (Docket No. 191) at 5. Jones' response to the complaints made on this point by the Defendants is that, because all three claims arose out of a common core of facts and were based on related legal theories, counsel's time was devoted generally to

the litigation as a whole and that, where that was not the case, the time spent on unsuccessful claims has been excised.

Jones' theory, of course, is supported by the Supreme Court's explanation to the same effect in Hensley.

> Many civil rights cases will present only a single claim. In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

Hensley, 461 U.S. at 435.

The Defendants make much of the fact that no time was devoted exclusively to the claim under the Dodd-Frank Act, but, as Jones explains, and correctly so, the Dodd-Frank claim and the Sarbanes-Oxley claim arose out of a common core of facts and involved identical and non-exclusive legal theories of recovery although there is a difference in one of the available remedies. As Jones explains, "[t]he only time spent not in furtherance of both Count I and Count II, given the same legal theory, was spent specifically addressing motions to dismiss Count II raised by Defendants," and a review of the time records submitted by Thorsen substantiate that explanation.

Jones makes the same argument with respect to time devoted to Count III which was a contract claim in which Jones asserted that the wrongful termination deprived Jones of certain stock options to which she otherwise would have been entitled. Jones has not shown how much time was devoted to this theory. However, there can be little doubt that some time was devoted to it, even though the record indicates that little attention was given to it by Jones' counsel. Nonetheless, it is a claim upon which Jones did not prevail, as to which the fee application does not demonstrate a reduction of the sort called for when a claim has been pursued unsuccessfully. Accordingly, the Court will deduct another 27.8[3] hours from the allowable time expended to account for the failure to prove the quantum of time devoted to Count III, the unsuccessful breach of contract claim.

Second, the Defendants make the conclusory assertion that Thorsen and Roche also engaged in block billing. Defs. Opp. (Docket No. 186) at 14. However, they point to no entries that support the assertion. Moreover, an examination of the time records submitted show no block billing. Hence, the Court considers this objection to be without merit.

---

[3] The deducted 27.8 hours shall be divided between Thorsen and Roche in the same proportion as the previously excised 27.8 hours, which reflects a reasonable allocation of resources between a partner and an associate.

Third, the Defendants raise two isolated objections: one for billing for administrative tasks (e.g. drafting an engagement letter); another for "inputting and categorizing additional billing." Defs. Opp. (Docket No. 186) at 13. The Defendants are correct that entries such as those should have been deleted in the exercise of billing judgment. The total time for those two grounds of objection represents 4.8 hours, and the time request will be reduced by the amount.[4]

Fourth, the Defendants argue that Roche's time for work on the case was generally excessive, considering that he made no court appearances and did not participate in the trial or in the depositions. That defect in the fee application, say the Defendants, requires a deduction of 46 hours from July 13 to July 18, 2013 for preparing for and attending trial. Here again, the Defendants have pointed to no specific work that was excessive during that period. They thus have failed to present an issue that is sufficiently identified to permit a ruling. The conclusory assertion does not permit either Jones or the Court to understand, much less address, the Defendants' point.

In any event, the time records show that Roche was present in court for the motions, pretrial proceedings, and trial. He assisted Thorsen who did the in-court work, and he helped

---

[4] Of the deducted 4.8 hours, 4.0 hours are attributable to Roche and .8 hours are attributable to Thorsen.

prepare the case for trial.  If there is to be a deduction on the ground that the time spent was excessive, the Defendants must do more than make a conclusory assertion to that effect.

The Defendants do make certain specific objections.  In those, they contend that Roche billed excessive amounts for certain tasks, such as 17.5 hours devoted to preparing a witness list and exhibits, 6.5 hours to drafting objections to discovery requests, and post-judgment discovery in the amount of 34.41 hours, most of which was completed by Roche.  The preparation of exhibit lists and witness lists is simply not a rote task but requires considerable time to make sure that the Court's orders respecting pretrial filings are satisfied.  The objection to the time (6.5 hours) Roche spent preparing objections to discovery requests likewise requires thought and legal research and that amount of time seems reasonable.  Given the approach to the defense of this case and the issues respecting the availability of resources to satisfy the judgment, the Court finds that it is not at all unreasonable for the plaintiff to have spent 34.41 hours in the post-judgment discovery process.  Nor is it unreasonable to have had Roche, a junior associate, doing most of that work.

Fifth, the Defendants take the view that Jones was not successful in certain aspects of the case, such as the Defendants' efforts to reduce the damage awards on which the

Defendants partially prevailed, in opposing the Defendants' request to take jurisdictional discovery, and in opposing the efforts of the first counsel for the Defendants to withdraw from the case.

It is correct that the Defendants, to some extent, were successful in reducing the damage award. However, the reduction of a damage award is not an unsuccessful claim as to which a fee request needs to be reduced in the same manner as not succeeding on the claim at all. The same is true of opposing discovery requests and opposing the efforts of the Defendants' first counsel to withdraw.[5]

Sixth, the Court asked Jones to supplement her petition by itemizing the time spent devoted to jurisdictional issues. The Court sought that information in the event that it determined that the plaintiff's request for an assessment of joint and several liability for attorneys' fees was not appropriate and that, therefore, the attorneys' fees should be allocated in some different way. For the reasons stated in Part D below, there is

---

[5] Opposition to the withdrawal of Defendants' first counsel was especially appropriate in this case because that lawyer had reached a settlement in the case and recommended that it be implemented by the Defendants. It was reasonable for Jones' counsel to oppose the withdrawal of the lawyer who had struck a deal that would resolve the litigation at a very early stage. Moreover, that lawyer, an imminent and respected trial lawyer in this area, has a reputation for being a reasonable, albeit zealous, adversary. Any lawyer would prefer to have such an opponent in the case.

no need to sort through the paltry objections made by the Defendants to the itemization requested as to the jurisdictional discovery.

Seventh, the Defendants reprised, albeit in an unusual way, their block billing argument in their response to Jones' supplemental showing that was required by the Court as to the work done in nine different categories of service.  See Defs. Supp'l Opp. (Docket No. 191) at 9.  There, they assert:

> Further, nearly all of the time entries are non-specific and it is difficult if not impossible to tell exactly what was done and whether any individual time entry has been property [sic] categorized.  In addition, the majority of time entries are recorded in whole hour, multiple hour, and half hour increments and/or 'block billed.'
> One likely explanation for this can be found in the affidavits submitted by Messrs. Thorsen and Roache [sic] in support of the Attorney Fee Petition.

That reference is to a statement made in the original fee petition (Docket No. 184), Exhibit A, (Docket No. 184-1) wherein Thorsen states:

> The majority of the time set forth in Exhibit 'A' was recorded contemporaneously with the work being done.  Time not specifically noted represents standard time for such noted work, like letters received, reviewed, and sent.

Unfortunately, Jones did not identify which entries were contemporaneously entered and which were reconstructed.  The Court previously has held that reconstructed time entries are

28

not acceptable because "it is nigh onto impossible to reconstruct old billing entries accurately. Estimates of the sort made here, while attempted in good faith, are actually little more than guesses when made for entries logged long in the past." McAfee, 904 F. Supp. 2d at 499. The same rationale applies to the reconstructed time entries here.

Moreover, where counsel is prosecuting an action as to which the applicable statute allows for an award of a prevailing party's attorney's fees, counsel is charged with the knowledge that a fee application will be required if the party prevails. It is not demanding too much to require that, in such cases, counsel record time contemporaneously because, however acceptable the alternative may be to a client, the practice of reconstructing time records affords no reliable help to a court in assessing the quantum of attorney's fees that should be awarded under a statute that allows recovery of fees by the prevailing party.

It certainly is not the task of the opposing party upon whom fees are to be levied or the Court to search through time records to determine which entries appear to have been contemporaneously made and which entries are reconstructed entries. When confronted with such a situation, the adversary and the Court are in the same position as when confronted with block billing. As noted previously, the time tested and

generally accepted remedy for block billing is an across-the-board reduction of some magnitude.

Here, given the state of the record and the fact that Jones has not explained what entries are contemporaneous and what entries are reconstructed, the generally accepted reduction for block billing would seem appropriate.  Therefore, a deduction of 10% across the board will be assessed.  That deduction will be applied after the specific deductions required herein have been made.

Eighth, in examining the time records, the Defendants have raised a number of objections to the listing of time devoted to different categories as required by the Court in its effort to ascertain a fee that is reasonable.  Those objections are addressed below:

- **Initial Case Analysis.**  The Defendants make the conclusory objection that the 201 hours requested by Sands Anderson are duplicative of the 32.7 hours for such work listed in revised Exhibit A.  The Defendants make no showing whatsoever why that should be appropriate given that most of the Sands Anderson work was devoted to the administrative process which is a condition precedent to bringing an action in court.[6]

_____

[6] The Court previously has dealt with the work by Sands Anderson in preparing a complaint.

• **Motions Practice**.   The Defendants oppose the 45.6 hours claimed by Jones' counsel to address an assertion of Fifth Amendment privilege was being raised by a third party, a former employee of the defendant, SouthPeak Interactive Corporation. The time devoted to that task was 45.6 hours.   Having presided over the issue, and considering that the issue involved substantial legal research, an in-court hearing, and numerous telephone conversations, as well as negotiations by which the issue was ultimately resolved, the Court finds that the time devoted to that task is reasonable.   In that regard, the Court notes that the Defendants make the conclusory assertion that the time is excessive without addressing why that is so.   That simply is an unacceptable objection.

• **Depositions**.   The objection is that "spending 103.43 hours on depositions and then spending an additional 34.41 hours reviewing those depositions is excessive and should be reduced." Defs. Supp'l Opp. (Docket No. 191) at 11.   Again, that is a conclusory objection, offering no explanation as to why it is true.   Thus, it could be rejected for that reason alone. Moreover, the objection borders on the frivolous because it is beyond question that one must review the depositions taken in order to prepare for trial and to use them at trial either as affirmative evidence or for impeachment.   Indeed, it is beyond belief that any competent trial lawyer would go to trial without

reviewing the deposition testimony. In addition, review is necessary to comply with the requirements of the Court's Pretrial Order that discovery designations are to be specified specifically by page and line and objections thereto are to be filed.

• **Trial Preparation.** The Defendants contend that 250 hours in trial preparation is excessive. Again, the Defendants make no explanation for why that is so, relying instead on a conclusory *ipse dixit*. The amount of time claimed for trial preparation is substantial. However, the requirements of the Court's Pretrial Order are quite demanding. Those requirements are implemented with the view to making the trial go smoothly, saving the time of the jury, and assuring that there is a record of rulings made before trial. Those efforts are fairly counted in trial preparation. Also, the case involved approximately fifteen depositions, and it is necessary to be prepared to use those depositions to impeach the testimony of witnesses who may testify. Often that time turns out not to be necessary because the witness does not make impeachable statements, but a lawyer would be foolhardy not to be prepared to impeach a witness who has previously testified at a deposition. That is standard trial preparation.

Further, it is essential in preparing for trial that the lawyer have a command of the exhibits, and it takes time to

achieve a mastery sufficient to allow the lawyer to use exhibits affirmatively and to make objections to unfair or improper use of exhibits.    The tasks of preparing witnesses, preparing opening statements and closing arguments and in preparing and objecting to instructions are all time consuming endeavors.    A review of the time records demonstrates that the trial preparation time was reasonable here.

• **Post-Judgment Motions**.    The Defendants object to 173.06 hours devoted to post-judgment motions and post-judgment discovery requests, 66.31 hours of which is attributed to the preparation of the fee petition.    The theory upon which the Defendants predicate this argument is that "the amount of hours attributed to post-judgment motions is excessive and in light of the limited success Jones obtained at the post-judgment stage, it is not reasonable and it should be reduced."    As previously noted, Jones had substantial and material success at trial, and it was necessary for her to defend the verdict post-trial because the Defendants made numerous assaults upon it.    The Defendants cannot now be heard to contend that it was unreasonable for Jones to have responded to positions asserted by the Defendants, some of which were quite frail.    Moreover, it is not true that Jones had limited success.    Jones retained a large portion of the total judgment and she successfully opposed the Defendants' request for a new trial.

## C.    The Lodestar Fee

Given the Court's determinations herein, using the approved hourly rates and reducing the time as herein indicated, the revised lodestar calculation is as follows:

**Sands Anderson:**
201.30 hours X $300.00 = $60,390.00
Less 10% =                                             **$ 54,351.00**

Thorsen:
539.45 hours - 1.6 hours = 537.85 hours
537.85 hours X $420.00 = $225,897.00
Less 10% =                                             $203,307.30

Roche:
459.75 hours - 31 hours = 428.75 hours
428.75 hours X $250.00 = $107,187.50
Less 10% =                                             $ 96,468.75

**Marchant, Thorsen, Money, Baldwin**
**& Meyer, LLP:**                                      **$299,776.05**

**Total Attorneys' Fees:**                             **$354,127.05**

## D.    Distribution of Fees

Next, Jones argues that the Defendants should be held jointly and severally liable for all of the attorneys' fees awarded to Jones under 18 U.S.C. § 1514A(c)(2)(C). See Pl. Mem. Supp. (Docket No. 185) at 17-18. The Defendants think otherwise. Circuit courts have acknowledged that liability for attorneys' fees is to be allocated at the trial court's discretion. See Herbst v. Ryan, 90 F.3d 1300, 1304 (7th Cir. 1996); Corder v. Gates, 947 F.2d 374, 381 (9th Cir. 1991); Koster v. Perales, 903 F.2d 131, 139 (2d Cir. 1990); Council for Periodical

Distributors Assn's v. Evans, 527 F.2d 1483, 1487 (11th Cir. 1987); Grendel's Den, Inc., v. Larkin, 749 F.2d 945, 959-60 (1st Cir. 1984). In Periodical Distributors, the Eleventh Circuit surveyed the judicial landscape and found that courts have applied a wide variety of criteria and analytical approaches to the apportionment question. These include:

1. Joint and several liability among defendants;

2. Equal division of fees among defendants;

3. Division of fees by degree of relative culpability among defendants;

4. Division of fees by proportion of actual damages awarded against each defendant;

5. Division of fees by proportion of plaintiff's time spent preparing the case against each defendant;

6. Assignment of particular fees, in cases where additional fees were incurred because of a specific defendant's participation in the defense of the case;

7. Assignment of fees related to a particular claim, in cases where a specific defendant was solely or predominately responsible for that claim; and

8. A combination of two or more of the above methods.

See 827 F.3d at 1488 (citations omitted). Cf. Grendel's Den, Inc., v. Larkin, 749 F.2d 945, 959-60 (1st Cir. 1984) (alluding to approaches 2, 3, 4, 5, and 8). In selecting among these approaches, a district court should be mindful of the purpose of the relevant attorney fee statute and any federal policies that

might be implicated. See Herbst v. Ryan, 90 F.3d 1300, 1304-05 (7th Cir. 1996).

The Court begins its analysis by noting that all three Defendants were found liable on a single count of unlawful retaliation in violation of 18 U.S.C. § 1514A. Further, Jones suffered a single injury as a result of the Defendants' actions: termination of her employment. The jury, in its role as factfinder, allocated the various types of compensatory damages created by that one injury. Thus, the initial jury verdict awarded $593,000 in compensatory damages against SouthPeak, $178,500 in compensatory damages against Phillips, and $178,500 in compensatory damages against Mroz. That judgment was amended and remitted by this Court to encompass $470,000 in back pay and $123,000 in compensatory damages against SouthPeak, $50,000 in compensatory damages against Phillips, and $50,000 in compensatory damages against Mroz. See Docket No. 179.

Both of the individual Defendants had prominent roles within the corporate Defendant and played a significant role in Jones' unlawful termination.  Mroz was the President and CEO of the company, as well as a company Director. She voted in favor of Jones' termination and personally told Jones that she had been fired.

Phillips was the Chairman of the Board of Directors and the majority shareholder of SouthPeak. He also voted in favor of

36

Jones' unlawful termination. Phillips provided SouthPeak with a personal advance of funds, and SouthPeak, with Phillips' knowledge, failed to disclose that transaction. Jones' termination was in retaliation for her efforts to report that failure. Jones' reporting efforts threatened to expose Phillips to personal liability, as evidenced by the $50,000 civil penalty he later received from the SEC for his involvement in this transaction. He thus was highly motivated to be rid of Jones who, according to the evidence, was a substantial thorn in his side.

The Defendants have taken the position that, in the absence of joint and several liability against defendants on the merits of a case, a court cannot make the defendants jointly and severally liable for an award of attorneys' fees. See Defs. Opp. at 17. However, none of the cases cited by the Defendants have adopted that proposition.

In Dean v. Gladney, 621 F.2d 1331 (5th Cir. 1980), the Fifth Circuit rejected a joint and several award of attorney's fees in case involving four different plaintiffs. The Court held that, because one of the defendants was liable to only one of the plaintiffs and was not implicated in the injuries sustained by the other plaintiffs, he should not be held jointly and severally liable for all of the attorneys' fees incurred by the collective group of plaintiffs. Id. at 1339. Dean suggests that

attorney's fees can be joint and several only when defendants are joint tortfeasors.   And, here all Defendants were adjudged to be joint tortfeasors.   Dean certainly does not preclude joint and several attorney's fees in those cases where a jury takes it upon itself to divide the awarded damages between those whom it has found to be joint tortfeasors.

Kentucky v. Graham, 473 U.S. 159 (1985) and Koster v. Perales, 903 F.2d 131 (2d Cir. 1990) also do not stand for the proposition cited. In Kentucky v. Graham, the Supreme Court held that a government entity's immunity from liability on the merits also provided immunity from any imposition of attorney's fees under 42 U.S.C. § 1988. 473 U.S. at 163-165. In doing so, the Court set forth the principle that, "where a defendant has not been prevailed against either because of legal immunity or on the merits, § 1988 does not authorize a fee award against that defendant." Id.   Koster v. Perales extended that logic by ruling that a settlement favorable to the plaintiff's interest could make the plaintiff a "prevailing party." 903 F.2d at 135. Accordingly, the Koster court affirmed the trial court's decision to grant a joint and several award of attorneys' fees against the state and local government entities. Id. at 138. Because Jones has unquestionably prevailed against all three Defendants in this action, neither Graham nor Koster restricts her ability to recover attorneys' fees from the Defendants.

A more illustrative example of a trial court's discretion can be found in Molnar v. Booth, 229 F.3d 593 (7th Cir. 2000), wherein a teacher successfully sued a school corporation and a principal under Title VII and § 1983. A jury awarded the plaintiff $500 in actual damages against the school, $500 in actual damages against the principal, and $25,000 in punitive damages against the principal. Subsequently, the district court awarded the plaintiff $65,760 in attorneys' fees jointly and severally against both defendants. Id. at 605.

On appeal, the Seventh Circuit held that the joint and several award of attorneys' fees was not an abuse of discretion. The court found that the plaintiff's "attorneys' fees were indivisible, because so many of the issues against the two defendants were the same or similar." Id. Further, "[w]hen two or more defendants actively participate in a constitutional violation, they can be held jointly and severally responsible for indivisible attorneys' fees." Id. (citing Herbst v. Ryan, 90 F.3d 1300, 1305 (7th Cir. 1996)). Finally, the Molnar court acknowledged the individual defendant principal's role as "an important moving force behind [the school corporation's] policies." Id.

The comparison between the facts of this case and those of Molnar is instructive. Whereas the ratio between the total damages awarded against the Molnar defendants was 51 to 1, the

ratio between the total damages awarded against SouthPeak and the damages awarded against the individual Defendants is a more modest 12 to 1. Both of the individual Defendants were highly instrumental in the decision to terminate Jones. Mroz voted to terminate Jones and personally communicated news of that termination to her. Phillips was the moving force behind the initial transaction that Jones sought to report. He too voted to terminate Jones. It is, indeed, beyond comprehension, on this record, that Jones would have been terminated if Phillips and Mroz had thought otherwise. Many of the issues against SouthPeak and the individual Defendants were the same or similar, making those fees indivisible as to Count I.

In light of the fact that Jones prevailed against all three Defendants on the same claim for the same wrongful conduct, and in acknowledgement of the role Mroz and Phillips played in guiding the actions of the corporate Defendant SouthPeak, the Court finds it appropriate to award attorneys' fees jointly and severally against all three Defendants.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part PLAINTIFF'S PETITION FOR ATTORNEYS' FEES AND COSTS (Docket No. 184). The Court awards Jones fees in the

amount of $354,127.05, jointly and severally against all three Defendants - SouthPeak, Mroz, and Phillips.

It is so ORDERED.

                                    /s/        _R E P_

                              Robert E. Payne
                              Senior United States District Judge


Richmond, Virginia
Date: July 1, 2014